UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:10CV01561 AGF |
| | ) | |
| JOHN P. ARTHUR, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the United States of America's motion for summary judgment (Doc. No. 46), the response of Defendant Tandy Thompson ("Thompson") thereto (Doc. Nos. 63 and 73), and the motion of William C. McIlroy, Trustee, ("Trustee") for Order of Discharge and Allowance of Attorney's Fees (Doc. No. 79). For the reasons set forth below, the motion of the United States will be granted, and the motion of the Trustee will be granted in part and denied in part.

## BACKGROUND

The United States commenced this action to reduce to judgment Defendant John P. Arthur's ("Arthur") unpaid federal tax assessments for the years 1994 through 1998 and 2001 through 2005, and to foreclose on federal tax liens on four parcels of real property

described in the complaint as "Parcels A,[1] B,[2] C,[3] and D."[4]  Parcel A is located in St.

_____

[1]    The legal description of Parcel A is:  Lot 1 of Pelham Estates, as per plat thereof recorded in Plat Book 259 Page 32 of the St. Louis County Records. The physical address of Parcel A is 12804 Pelham Estates Drive, St. Louis, Missouri 63131.

[2]    The legal description of Parcel B is: The Southeast Fourth of the Northwest Quarter of Section 19, Township 53 North, Range 2 West, except one-half acre off the North part thereof, to be laid off in a parallelogram so as to include two springs.  40 acres the Northwest Quarter of the Southeast Quarter, 40 acres the Northeast Quarter of the Southwest Quarter and 10 acres being Lot "F" of the Subdivision of Lot 2 of the Southwest Qr., all in Section 19, Township 53, Range 2 West of the 5th Principal Meridian.  The physical address of Parcel B is 16721 Pike 289, Bowling Green, Missouri 63334.

[3]    The legal description of Parcel C is:  An undivided one-half interest in and to a strip of land 16 feet wide, commencing at the center of Section 19 in Township 53North, Range 2 West, thence West to the Northwest corner of the Northeast Quarter of the Southwest Quarter of said Section 19,Township 53 North, Range 2 West, thence South one-half Quarter to the Northeast corner of the 10 acre tract known and designated as Lot "F" of the subdivision of Lot No. 2 of the Southwest Quarter of said Section 19, Township 53 North, Range 2 West, thence West on the North Side of said Lot "F" of said Subdivision One Quarter of a mile to the road running North and South on the West side of said Lot "F," the same being 16 feet wide off of the North side of said Northeast Quarter of the said Southwest Quarter, and off the West side of said Northeast Quarter of said Southwest Quarter and also off the North side of said Lot "F" of said subdivision of said Lot No. 2; said 16 feet of ground being for road purposes.  The physical address of Parcel C is 16721 Pike 282,Bowling Green, Missouri 63334.

Although not a material fact in this case, there is a discrepancy in the record involving the address of Parcel C.  Arthur testified that the address of Parcel C is 16721 "Pike 289" rather 16721 "Pike 282," as reflected in the amended complaint in this action. However, the Pike County Assessor's records show the property address as "Pike 282."

[4]    The legal description of Parcel D is:  All of Lots "D" and "E" of the James M. Martin's Subdivision of the Southwest Quarter of Section Nineteen (19) in Township Fifty three (53) North, Range Two (2) West, and being a part of Lot 2 of said Sub-division each of said Lots "D" and "E" hereby conveyed contains 10 acres, and 20 acres in all, is hereby conveyed. The physical address of Parcel D is 16803 Pike 289, Bowling Green, Missouri 63334.

Louis County, Missouri, and Parcels B, C, and D are located in Pike County, Missouri.

Acting pursuant to 26 U.S.C.§ 7403(b), the United States named Thompson and Community State Bank ("CSB") as Defendants[5] in this action because of their claimed interests in the properties. CSB claimed security interests in Parcels B, C, and D under a deed of trust dated July 3, 2003 ("CSB Deed of Trust"), arising from loans made to Arthur and Thompson. The United States and CSB stipulated that CSB's interests in Parcels B, C, and D were superior to the United States' federal tax liens on the parcels. (Doc. No. 35.) CSB claimed no interest in Parcel A.

Thompson claims an interest in all four parcels. After the filing of this action, Thompson filed two state court actions against Arthur involving, among other things, the four parcels at issue in this case. She failed to name the United States as a party defendant in those cases, and the United States intervened in those actions, subsequently removing them to this Court.[6]

The United States has moved for summary judgment, asserting that there is no genuine dispute of fact and that, as a matter of law, (1) Arthur's unpaid taxes should be reduced to judgment; (2) the United States has valid federal tax liens on Arthur's real estate; (3) those liens should be foreclosed; and (4) the net sale proceeds from that real estate should be distributed to the interests determined by this Court.

---

[5]     The United States also named the Missouri Department of Revenue ("MDR") as a Defendant, but the Court dismissed the MDR as a party because it claimed no interest in the subject parcels.

[6]     By agreement of the parties, proceedings in those two lawsuits have been stayed pending a ruling in this case.

On November 18, 2011, after the filing of the United States' motion, CSB gave timely notice to the Internal Revenue Service ("IRS") of its intent to foreclose on its interests in Parcels B, C, and D. CSB thereafter foreclosed on those properties and intervened in this action by interpleader, depositing the surplus sale proceeds of $236,408.44 into the Court's registry. (Doc. No. 35 at ¶ 2.) Thereafter, the Court dismissed CSB as a party, substituting the Trustee for CSB as Defendant. In addition to an order of discharge, the Trustee seeks to recover attorney's fees attributable to the interpleader. The United States opposes the request for fees on the ground that such recovery will impermissibly reduce its own recovery on the tax lien.

Upon review of the record before it the Court finds the following undisputed facts. Arthur, a licensed Doctor of Veterinary Medicine, performed services as a veterinarian from 1967 to December of 2010. He earned income as a veterinarian for the tax years 1994 through 1998 and 2001 through 2005, but failed to file federal income tax returns for 1994 through 1998 and to report the taxes he owed on account of that income. Due to Arthur's failure to file his returns for tax years 1994 through 1998, the IRS examined Arthur's income for those years and issued examination reports. Arthur signed the examination reports, thereby consenting to the immediate assessment and collection of the taxes, penalties and interest detailed in them. The earliest of these assessments occurred on September 4, 2000. Thereafter, Arthur failed to timely file his federal income tax returns for the years 2001 through 2005 or to pay the taxes reported on his late-filed returns for those years. Based on the signed examination reports for 1994 through 1998 and Arthur's late-filed returns for 2001 through 2005, the IRS assessed

federal income taxes, penalties, and interest against Arthur for these periods, on the dates and in the amounts indicated below:

| Tax Year | Date Assessed | Tax Assessed | Tax Penalty Assessed | Interest Assessed |
|---|---|---|---|---|
| 1994 | 09/04/00 | $16,316 | $2,727.77 | $ 5,388.38 |
| 1995 | 09/11/00 | 12,607 | 3,832.22 | 5,677.24 |
| 1996 | 09/04/00 | 20,727 | 10,943.72 | 8,287.44 |
| 1997 | 09/04/00 | 48,017 | 8,225.92 | 4,192.24 |
| 1998 | 09/04/00 | 21,807 | 11,353.02 | 3,369.49 |
| 2001 | 01/12/04 | 463 | 124.36 | 29.64 |
| 2002 | 01/05/04 | 4,635 | 1,209.54 | 1,251.44 |
| 2003 | 07/07/08 | 10,013 | 4,889.04 | 3,919.11 |
| 2004 | 07/07/08 | 6,954 | 3,119.95 | 2,241.12 |
| 2005 | 06/30/08 | 5,224 | 1,880.64 | 1,112.86 |

Arthur and Thompson had a relationship for over 21 years, but the nature of their relationship is unclear and, during this case, they have given conflicting statements under oath regarding their marital status.[7] During the course of their association, and as discussed below, they jointly or individually acquired the parcels at issue in this case.

On October 13, 1989, Arthur and Thompson acquired Parcel A as joint tenants with the right of survivorship through a general warranty deed. (Doc. Nos. 43, 44, and 48-14.) On May 1, 1998, Russell and Alice Benfield ("the Benfields") conveyed Parcel B to Arthur under a general warranty deed. (Doc. Nos. 43, 44 and 48-15.) On May 1, 1998, the Benfields also transferred to Arthur by a quit claim deed, an undivided one half

---

[7]    These inconsistencies are not material to the case in its current posture because Thompson's asserted interests in the subject properties do not depend upon her marital relationship, if any, with Arthur. In addition, the United States apparently concedes that Thompson has enforceable interests in Parcels B, C, and D as a result of the May and June 2001 conveyances of those properties.

interest in Parcel C.  (Doc. Nos. 43, 44 and 48-16); (Doc. No. 48-29, Dep. of Pike County Title Company ("PCTC") Designee William McIlroy ("PCTC Dep."); at 42:6-9.)

Prior to the closing for the purchase of Parcels B and C, PCTC sent Arthur a title insurance commitment for Parcel B, listing "John P. Arthur" as the "Proposed Insured." (Doc. No. 48-23; PCTC Dep. 12:11-13).  PCTC also required that Arthur provide in writing the name of anyone not referred to in the title insurance commitment who was to obtain an interest in Parcel B.  *Id.*; PCTC Dep. 13:8-21; 14:1-11.  Arthur did not add any other persons, and PCTC has no record of any written statement from any source indicating that Thompson would receive an interest in Parcel B or of a request by Arthur or Thompson to include Thompson's name on any of the documents involving Arthur's purchase of Parcels B and C from the Benfields.   PCTC Dep. at 8:8-22; 9:1-5; 50:6-11.

Arthur's signature appears on the documents executed on May 1, 1998, the date on which the Benfields conveyed Parcels B and C.  The purchase agreement, the buyer's settlement statement, the earnest money check, the acknowledgment form delivered to his realtor, and the quit claim deed bear Arthur's name or signature, as appropriate, and do not bear Thompson's signature or otherwise make reference to her.  (Doc. Nos. 48-18, 48-19, 48-20, 48-21, 48-22); PCTC Dep. 26:18-22; 27:1-4; (Doc. No. 48-27, Dep. of John Arthur ("Arthur Dep."), at 80:6-22; 88:10-14; 89:3-15; 92:5-11; 94:11-15.)

Thompson was not present when the contract for the purchase of Parcels B and C was signed by Arthur or the Benfields and she did not execute either of the lines on that contract designated for the buyer's signature.  Thompson testified on deposition that the

contract reveals that only Arthur signed it as the buyer.  (Doc. No. 48-28, Dep. of Tandy Thompson ("Thompson Dep."), at 90:15-22.)

In addition, Thompson testified that shortly after Arthur and the Benfields executed the purchase agreement for parcels B and C and before the closing, she saw a copy of the purchase agreement and realized that she had not signed it, but has no recollection as to why she did not sign the purchase agreement.  She further testified that despite this realization, she decided that her failure to sign the purchase agreement was a "moot point."  She testified: "The offer had been accepted.  Why did my name need to be added?"  (Doc. No. 80-1, Thompson Dep. at 90:15-22; 91:14-22; 92:1-6; 94:6-12.)

Thompson attended the closing on Parcels B and C but did not sign the buyer's declaration or any other document related to the sale "[b]ecause it wasn't passed to [her]."  (Doc. No. 80-1; Thompson Dep. 95:1- 96:-11.)  She testified that because no documents were passed to her for signature at the closing, she assumed that her signature was not necessary and that it never occurred to her that she had been "omitted" from the purchase.  *Id.*

The federal tax assessments relating to tax years 1994 through 1998 were issued against Arthur on September 4 and September 11, 2000.  Thereafter on May 20, 2001, Arthur and Thompson entered into a contract to purchase Parcel D from Benjamin and Jayne Yoder ("the Yoders").  (Doc. Nos.  43, 44, 48-10, and 48-17; Thompson Dep. at 85:15-22; 86:1-5.)

On June 29, 2001, after the federal tax assessments for 1994 through 1998 were issued against Arthur, Arthur and Thompson, "husband and wife," executed and filed a

general warranty deed conveying Parcels B and C to themselves as "husband and wife." (Doc. Nos. 43, 44, and 48-9.) On that same day, the Yoders transferred Parcel D to Arthur and Thompson under a general warranty deed. *Id.*

During 2004 and 2008 the IRS assessed additional delinquent tax liabilities against Arthur for tax years 2001 through 2005. On May 1, 2009 and July 14, 2009, the IRS filed a notice of its federal tax liens against Arthur for all of the subject tax years in St. Louis and Pike Counties, respectively. Revenue Officer Brown Decl. at ¶¶ 4 and 5. Arthur does not contest that he owes federal income taxes for 1994 through 1998 and 2001 through 2005 in the amounts assessed or that his taxes for these years remain unpaid.[8] (Arthur Dep. at 64:2-8, 18-22; 65:1-12.)

## Applicable Law

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, a court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the record. *Sokol & Assocs., Inc. v. Techsonic Indus., Inc.*, 495 F.3d 605, 610 (8th Cir. 2007); *Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2005). The burden of demonstrating that there are no genuine issues of material fact rests on the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "'Mere

---

[8]     As of  November 21, 2011, the amounts owed totaled $311,262.

allegations not supported with specific facts are insufficient to establish a material issue of fact and will not withstand a summary judgment motion.'" *Depositors Ins. Co. v. Wal-Mart Stores, Inc.,* 506 F.3d 1092, 1095 n.3 (8th Cir. 2007) (quoting *Henthorn v. Capitol Commc'n, Inc*., 359 F.3d 1021, 1026 (8th Cir.2004)). To be material, a factual issue must potentially "'affect the outcome of the suit under the governing law.'" *Depositors Ins. Co.,* 506 F.3d at 1096. An issue of fact is genuine if it has a real basis in the record; and, a genuine issue of fact is material if it "might affect the outcome of the suit under the governing law." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citations omitted).

When considering a motion for summary judgment and viewing the evidence, the court is not permitted to "weigh evidence or make credibility determinations." *Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003). To defeat a motion for summary judgment, the non-moving party "must demonstrate that at trial it may be able to put on admissible evidence proving its allegations." *JRT, Inc. v. TCBY Sys., Inc.*, 52 F.3d 734, 737 (8th Cir. 1995). Rule 56(c) requires that supporting and opposing affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein[.]" *Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005). Consistent with these requirements, hearsay evidence will not be given effect in considering a motion for summary judgment. *Id.*; *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 727 (8th Cir. 2001).

**Discussion**

Arthur does not contest the United States' motion for summary judgment in any manner; only Thompson opposed the motion. The United States has thus established that it is entitled to judgment against Arthur for the unpaid taxes, which, with penalty and interest, totaled $311,262 as of November 21, 2011. The United States has also established that it has valid federal tax liens on Arthur's interest in the real estate at issue (or its proceeds), and that its liens should be foreclosed. The question is to what extent those liens take priority over the interests of Thompson in Parcel A, and in the proceeds from the sale of Parcels B, C, and D.

In opposition to the United States' motion for summary judgment on its lien foreclosure claims, Thompson contends that, equitably, she is the "sole owner" of all four parcels at issue, or in the alternative, (2) that she has lien interests in Parcels B and C that attached prior to those of the United States. Thus, the dispute between Thompson and the United States hinges upon the question of whether Thompson had an interest in any of the parcels at issue and whether her interest was superior to Arthur's interest (as sole owner) or that of the United States under its federal tax liens.

The "[p]riority [of liens] for purposes of federal law is governed by the common-law principle that 'the first in time is the first in right.'" *Minnesota Dep't of Revenue v. United States*, 184 F.3d 725, 728 (8th Cir. 1999) (quoting *United States v. McDermott*, 507 U.S. 447, 449 (1993)). According to federal law, "'the priority of a lien depends on the time the lien attached to the property in question and became choate.'" *Id*. at 728 (quoting *Cannon Valley Woodwork, Inc. v. Malton Construction Co.*, 866 F.

Supp. 1248, 1250 (D. Minn.1994)).  A federal tax lien attaches and becomes "choate" at assessment.  *See* 26 U.S.C. §§ 6321 (providing that the consequence of unpaid taxes after assessment is "a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person"), and 6322 (providing that the lien arises at the time assessment of unpaid taxes is made against delinquent taxpayer).  Therefore, the priority of a federal tax lien is based upon the time when the lien is assessed, not when it is filed.  *See United States v. Jepsen*, 268 F.3d 582, 584-85 (8th Cir. 2001) (holding that a tax assessment creates a lien in favor of the United States on all property and rights to property pursuant to 26 U.S.C. §§ 6321, 6322); *Minnesota Dep't of Revenue*, 184 F.3d at 728 ("The lien arises automatically when the assessment is made and continues until the taxpayer's liability is either satisfied or becomes unenforceable due to the lapse of time."); *Horton Dairy Inc. v. United States*, 986 F.2d 286, 291 (8th Cir. 1993) ("Federal law determines choateness and the federal rule is that liens are perfected in the sense that there is nothing more to be done to have a choate lien-when the identity of the lienor, the property subject to the lien, and the amount of the lien are established.") (quoting *United States v. Pioneer Am. Ins. Co.*, 374 U.S. 84, 89 (1963) (internal quotations omitted)).

In this case, the earliest federal tax liens were assessed and became choate on September 4, 2000.  A competing interest under state law, like that asserted by Thompson cannot take priority over those assessments unless (1) the state interest became choate before the federal tax assessment, *see Minnesota Dep't of Revenue*, 184 F.3d at 728, or (2) the state interest falls within the statutorily-defined exceptions to the IRS's lien

priority order.  *See In re Nerland Oil, Inc.* 303 F.3d 911, 916-17 (8th Cir. 2002) (citing

26 U.S.C. § 6323.)  Thompson does not assert that any of the statutorily defined

exceptions apply here.  Therefore, the Court will address only the nature of Thompson's

alleged interests and the dates upon which they arose.

     Thompson first contends that, equitably, she is the "sole owner" of all four Parcels

because she contributed funds to their purchase and expended funds for their maintenance

in amounts exceeding any monetary contribution from Arthur.

     The Court concludes that this argument lacks a basis under Missouri law.  State

law determines the rights of claimants to property subject to federal tax liens. *See United

States v. Craft*, 535 U.S. 274, 278 (2002).  In her opposition Thompson cites no case

law–and the Court is aware of none–suggesting that financial contribution toward the

purchase or maintenance of real property creates a title interest in that property.

Thompson's reliance on the interpretation of Missouri law set forth in *Neiman v. First

Nat'l Bank of Joplin*, 420 S.W.2d 20, 22 (Mo. App. Ct. 1967) is misplaced.  *Nieman*

involved a judgment creditor's attempt to invade a joint bank account to satisfy the debt

of one of the depositors. *Id.  Nieman* in no way stands for the proposition that an

individual may claim "sole ownership," of real property, not evidenced by deed or

contract, on the basis of an alleged monetary contribution to the purchase or expenditures

related to the maintenance of the property.  Thus, Thompson's assertion that she is the

"sole owner" of all the properties because she contributed funds to their purchase and

upkeep is neither supported by the law nor by sufficient evidence to raise a genuine issue

of fact.

Thompson next argues that her interest in Parcels B and C is superior to that of the United States because she obtained an interest in Parcels B and C in May of 1998, at the time of the Benfields' conveyance of those parcels, which was prior to the September 2000 federal tax assessments. In support of this contention, Thompson asserts that Arthur intended that she receive an interest in the property. She also references the handwritten letters "T.C." that appear on a copy of the purchase agreement for Parcels B and C, asserting the presence of these initials indicates that she signed the purchase agreement, and that, as a party to the agreement, she obtained an interest in Parcels B and C at that time.

The record before the Court does not support Thompson's argument. The undisputed facts are that Thompson was not present when the contract for the purchase of Parcels B and C was signed by Arthur or the Benfields and that she did not execute either of the lines on that contract designated for the buyer's signature. (Thompson Dep. at 90:15-20.) Thompson has testified that the purchase agreement clearly states that only Arthur signed it as the buyer. *Id.* She also has testified that she realized on the day of the closing that she had not signed the purchase agreement, but decided that this was a "moot point." (Thompson Dep. 90:8-10; 90:15-22; 91:14-22 ;92:1-7; 94:6-12.)

Even if Thompson subsequently placed her initials on a copy of the purchase agreement, doing so would not be sufficient to create an interest in these parcels under Missouri law unless she could also establish her intention to authenticate the writing as a signer. *Vess Beverages, Inc. V. Paddington Corp.*, 941 F. 2d 651, 654 (8th Cir. 1991) (citations omitted). Thompson has not provided, as required in opposition to a motion for

summary judgment, an affidavit or other sworn testimony that she, in fact, wrote the letters "T.C." on the contract at the time of the May 1998 conveyance with the intention of becoming a party to the agreement. Instead, she offers only her testimony that the letters "T.C." are her initials and appear on the purchase agreement next to a phone number and address that she and Arthur both used. (Thompson Dep. at 90:15-22; 91:1-13.) These facts, without more, are insufficient to refute the evidence on record that Arthur was the sole purchaser of Parcels B and C in May of 1998 or to create a material dispute as to whether Thompson acquired an interest in Parcels B and C before September 4, 2000.

Thompson further contends that the May 1, 1998 purchase agreement and the May 2, 1998 general warranty deed conveying Parcels B and C are subject to reformation for mutual mistake because they do not express the intent of the parties. In support of this position, Thompson offers Arthur's deposition testimony that he intended her to receive an interest in Parcels B and C as a result of the May 1998 conveyance, and her own testimony that a PCTC employee, now deceased, told her that PCTC erred in recording the deed for the properties.[9]

"'Reformation of a written instrument is an extraordinary equitable remedy and should be granted with great caution and only in clear cases of fraud or mistake.'" *Simpson v. Simpson*, 295 S.W. 3d 199, 205 (Mo. Ct. App. 2009) (quoting *Ethridge v.*

---

[9] Although Thompson's testimony is not clear as to the precise nature of the "error," the Court assumes, for purposes of this motion, that the statement relates to failing to include her as an owner.

*Tierone Bank*, 226 S.W.3d 127, 132 (Mo. 2007) (internal citation omitted). "The party seeking reformation must show that the writing fails to accurately set forth the terms of the actual agreement or fails to incorporate the true prior intentions of the parties." *Id.* The burden of proof is upon the party seeking reformation to show by clear, cogent, and convincing evidence: (1) a preexisting agreement whose terms are consistent with the proposed reformation; (2) a mistake, here, a scrivener's error; and (3) the mutuality of the mistake. *See Brown v. Mickelson*, 220 S.W. 3d 442, 448-49 (Mo. Ct. App.2007) (citing *Engelland v. LeBeau*, 680 S.W.2d 435, 437 (Mo. Ct. App. 1984). "To support reformation for mutual mistake, the evidence must be clear, cogent, and convincing and upon testimony entirely exact and satisfactory." *Simpson v. Simpson,* 295 S.W. 3d 199, 204-05 (Mo. Ct. App. 2009) (quoting *Elton v. Davis*, 123 S.W.3d 205, 212 (Mo. Ct. App. 2003)).

In addition, Missouri courts generally do not grant relief by way of reformation for a mistake of law as opposed to one of fact. *Thompson v. Volini,* 849 S.W.2d 48, 50-51 Mo. Ct. App. 1993 (citing *Hysinger v. Heeney,* 785 S.W.2d 619, 624 (Mo. Ct. App.1990) (vacated on other grounds)). Where the parties' understanding of the facts coincide, but they are mistaken as to the legal effect of those facts, it is generally recognized that there is no basis for relief on the ground of mutual mistake. *Hysinger,* 785 S.W.2d at 624-25 (citing *Rhodes v. Rhodes' Estate*, 246 S.W.2d 98, 102 (Mo. Ct. App.1952)).

Finally, when making a determination with respect to mutual mistake, the Court has a duty to consider the wording of the contract signed by the parties, their relationship

and the circumstances surrounding the execution of the contract.  *Brown*, 220 S.W.3d at

449 (citing *Everhart v. Westmoreland*, 898 S.W.2d 634, 638 (Mo.Ct.App. 1995)).

Applying these principles, the Court must first determine whether Thompson has

come forth with evidence by which a reasonable finder of fact could find, by clear and

convincing evidence, that there was "a preexisting agreement" between the parties for

Thompson to receive an interest in Parcels B and C.  *See Thirty and 141 v. Lowe's Home*

*Centers, Inc.,* 565 F.3d 443, 446 (8th Cir. 2009) (citing *Brown,* 220 S.W.3d at 449).

As noted above, Thompson testified that she was not present when the contract for

the purchase of Parcels B and C was signed by Arthur or the Benfields, that she did not

execute either of the lines on that contract designated for the buyer's signature, and that,

the contract clearly reveals that only Arthur signed it as the buyer.  (Doc. No. 80-1;

Thompson Dep. at 94:6-12.)  In addition, Thompson testified that she was aware on the

day that Arthur and the Benfields executed the purchase agreement that she had not

signed it, but decided that this was a "moot point."   Moreover, although Arthur testified

that he intended Thompson to receive an interest in Parcels B and C, he nowhere testifies

that the parties had an agreement that Thompson would share title ownership.  He plainly

knew that she was not listed on the documents.  The record indicates that he failed to

designate Thompson as an additional purchaser on the title insurance declaration or any

other document relating to the purchase of Parcels B and C from the Benfields.  Likewise,

the record contains no sworn testimony by Thompson that she and Arthur "agreed" that

she would have a title interest in the property.  Even accepting as true Thompson's

testimony that she believed she was acquiring an interest in Parcels B and C, she also

testified that she realized that she had neither signed the purchase agreement nor executed any documents at the closing.

Upon review of the record and accepting as true the testimony of Thompson and Arthur as to their intentions and assumptions regarding the receipt by Thompson of an interest in Parcels B and C, the Court concludes that Thompson has not met her burden to show a preexisting agreement and asserts at most a mistake of law. The undisputed facts surrounding the execution of the documents, including Arthur's intention that Thompson receive, and her belief that she was receiving, an interest in Parcels B and C, could not have the legal effect of giving her an interest in Parcels B and C. She does not claim that she was unaware that her name did not appear on any of the documents or that she executed documents which were not given legal effect. She asserts instead that Arthur's intention that she receive an interest as well as her belief that she would receive such an interest was legally sufficient in the absence of her signature to convey her an interest in Parcels B and C. This is a mistake as to the legal effect of her actions or inactions and not as to the facts surrounding the execution of the May 1998 agreement.[10]

On the basis of these undisputed facts, the Court concludes that no rational jury could find, by clear and convincing evidence, a preexisting agreement for Thompson to obtain a title interest in Parcels B and C. In the absence of such an agreement,

---

[10]    Clearly the parties knew how to purchase property in a manner that conveyed a title interest to Thompson, as their earlier purchase of Parcel A was by both, as joint tenants with right of survivorship.

Thompson's claim of mutual mistake fails as a matter of law.  *See Brown,* 220 S.W.3d at 449.

In further support of her claim of mutual mistake, Thompson asserts that PCTC committed a "scrivener's error" by omitting her name from the May 1998 warranty deeds for Parcels B and C.  She asserts that an employee of PCTC, now deceased, told her that the failure to include her name on the deed was a "mistake."

The United States correctly identifies this evidence as hearsay, as it is the statement of an unavailable declarant offered for the truth of the matter stated, namely that PCTC committed a scrivener's error in omitting Thompson's from the deed.  On a motion for summary judgment, the Court may only consider hearsay evidence if it would be admissible at trial under an exception to the hearsay rule.  *See JRT, Inc. v. TCBY Sys., Inc.*, 52 F.3d at 737.  As the proponent of the evidence, Thompson bears the burden to establish its admissibility.  *See Brunsting v. Lutsen Mtns. Corp.*, 601 F.3d 813, 818 (8th Cir. 2010).

Thompson asserts that the statement is admissible under Federal Rule of  Evidence 804(b)(3), as a statement against interest.  The Court need not determine whether the statement satisfies the hearsay exception as Thompson contends, because even if the statement were deemed admissible, it would not alter the Court's determination that Thompson is unable to demonstrate clear and convincing evidence of a preexisting agreement to convey her an interest in Parcels B and C.  The proffered evidence, while relevant to the issue of whether a scrivener's error occurred, does not relate to the question of whether the parties agreed to convey a title interest to Thompson. *See Thirty*

*and 141*, 565 F.3d at 446. In the absence of a preexisting agreement to give Thompson an interest in Parcels B and C, the Court may not reach the question of whether a scrivener's error occurred.

Further, on the record before the Court, Thompson has failed to meet her burden to demonstrate that the title company employee's statement is admissible as an exception to the hearsay rule under Rule 804(b)(3). An unavailable declarant's statement may qualify as a statement against interest if, as judged by "a reasonable person in the declarant's position," the statement, when made, would only have been made if the person believed it to be true, because it "was so contrary to the declarant's propriety or pecuniary interest" or had "so great a tendency . . . to expose the declarant to civil or criminal liability." *Fed. R. Evid. 804(b)(3)*. Whether the statement was against interest "'can only be determined by viewing it in context' and will often require a delicate examination of the circumstances under which it was made." 2 *McCormick on Evidence* § 319 (6th ed.) (quoting *Williamson v. United States*, 512 U.S. 594, 602 (1994)). Here, as presented by Thompson, there is nothing to suggest that the alleged statement was against the declarant's pecuniary interest, or even that the employee would reasonably have believed that the statement would have exposed the title company to liability. According to Thompson, in the context of an additional purchase, the employee simply said there was an error, and that they would fix it, and that the correction would not cost Thompson anything. (Doc. No. 48-28; Thompson Dep. At 84:6-85:13.) This does not qualify as an admission against interest.

For these reasons the Court concludes that Thompson has not demonstrated a genuine issue of material fact that but for a mutual mistake her interest in Parcels B and C would be superior to those of the United States.

## Distribution of the Foreclosure Sale Proceeds

The Court having determined that the United States is entitled to summary judgment on its claims concludes that the funds derived from the foreclosure of its liens should be distributed as follows.

## Parcel A

With respect to Parcel A, the United States has demonstrated, and none of the parties have contested, that it has valid federal tax liens on this property. Thompson concedes that she and Arthur were each named in the warranty deeds for Parcels A (Doc. Nos. 48-14 and 48-17(D).) Thus, the Court concludes that, as a matter of law, the United States has valid liens on Parcel A on which it may legally foreclose and that those liens should be foreclosed. The United States will be entitled to recover one half of the net sale proceeds from Parcel A, attributable to Arthur's interest, and Thompson will be entitled to one-half, due to her joint ownership of that property.

## Parcels B, C, and D

The United States demonstrated, and no party disputes, that it had valid tax liens on Parcels B, C, and D with respect to Arthur's interests at the time its summary judgment motion was filed. Upon CSB's sale of those parcels, the tax liens were discharged from the properties and attached to the surplus sale proceeds with the same priority as its liens had against the real property. *See* 26 U.S.C. § 7425(b); *Phelps v.*

*United States*, 421 U.S. 330, 334-335 (1975) (finding that federal tax lien attached to sale proceeds); *Tony Thornton Auction Serv., Inc. v. United States*, 791 F.2d 635, 638 (8th Cir. 1986) (determining that federal tax liens for unpaid tax liens on the surplus proceeds and those liens should be paid from the surplus sale proceeds).

With respect to Parcels B and C, the United States has also demonstrated, as a matter of law, that its liens are superior to Thompson's interests in Parcels B and C with regard to the taxes assessed in 2000. Thompson has not shown that a genuine fact dispute exists as to whether the United States' lien interests on Parcels B and C are prior to her claimed interests in those parcels. As such, the interest she took in 2001 in these two parcels was subject to the IRS liens. Therefore, the United States' tax liens for the years 1994 through 1998 attach to and may be satisfied from the proceeds of Parcels B and C prior to Thompson's claimed interests because, on September 4 and 11, 2000, at the time those liens became choate, Arthur was the only owner of Parcels B and C.

Because Thompson acquired a 50% interest in Parcels B and C by the time the IRS liens attached for tax years 2001-2005, the IRS liens for the period after 2001 may be foreclosed only against Arthur's 50% interest in any remaining funds from Parcels B and C.

The United States has also shown that it and Thompson are each entitled to half of the net sale proceeds from Parcel D because of Thompson and Arthur's joint ownership of those parcels. Thompson concedes that she and Arthur were each named in the warranty deeds for Parcel D. (Doc. No 48-17.)

**<u>The Trustee's Motion to Discharge and for Attorney's Fees</u>**

The Trustee moves for an order discharging him from the case and to recover attorney's fees and costs incurred in bringing the interpleader.

With respect to the request for discharge, the Court notes that the purpose of an interpleader action is to shield a disinterested stakeholder from the risk of multiple liability or inconsistent obligations when several claimants assert rights to a single stake. *See Essex Ins. Co. v. McManus*, 2003 WL 21693659 *1 (E.D.Mo. May 30, 2003) (citing *Dakota Livestock Co. v. Keim*, 552 F.2d 1302, 1306–07 (8th Cir.1977)). Where a stakeholder is disinterested and has deposited the stake into the Court registry, the Court may dismiss it from the interpleader action, leaving the claimants to prosecute their conflicting claims. *See Essex,* 2003 WL 21693659 at *1. The Court finds that these requirements are met here and that the Trustee is entitled to an order of discharge.

The United States opposes the Trustee's request for attorney's fees asserting that such an award will impermissibly reduce the United States' recovery under its prior lien from the proceeds of the sale of Parcels B, C, and D. Normally, a stakeholder who brings an interpleader action to achieve the resolution of conflicting claims is entitled to an award of attorney's fees and costs. *See South & Associates, P.C. v. Ford* , No.4:07CV2021 JCH, 2008 WL 2906857, at * 2 ( E.D.Mo. Jul. 24, 2008)(citing *Byers v. Sheets*, 643 F.Supp. 695, 696–97 (W.D. Mo.1986)). However, such an award is prohibited by the Internal Revenue Code if its effect "'would be to diminish the amount recovered by the United States under a federal tax lien.'" *Id.* (quoting *Millers Mut. Ins. Ass'n of Ill*. v. Wassall, 738 F.2d 302, 303 (8th Cir. 1984)).

The Trustee contends that he is nonetheless entitled to an award of fees because the federal tax liens were extinguished by the sale of the properties. He further asserts that an award of attorney's fees should be made from the proceeds of the sale, and that any remaining funds should be distributed to Arthur and Thompson pursuant to the terms of the deed of trust.

Although the Trustee correctly asserts that under Missouri law, a foreclosure sale extinguishes junior liens, the extinction of junior liens on the real property does not affect the distribution of surplus proceeds to creditors after a foreclosure sale. *See In re Reid*, 73 B.R. 88, 90 (Bankr. E.D. Mo.1987). Therefore, the United States is entitled to recover the surplus proceeds from the foreclosure sale. *Stulz v. Citizen's Bank & Trust Co.*, 160 S.W.3d 423, 428 (Mo. Ct. App.2005) (citing *Jones v. Shepard*, 122 S.W. 764, 767 (1909)); *Strawbridge v. Clark*, 52 Mo. 21, 22 (1873); *Helweg v. Heitcamp*, 20 Mo. 569 (1855)). Because an award of attorney's fees to the Trustee could diminish the amount recovered by the United States under the federal tax lien, the Trustee's request for an award of attorney's fees will be denied, to the extent it would reduce the amount recovered by the United States. *See S & W Foreclosure Corp. v. .Okenfuss*, No. 4:09CV353 CDP, 2010 WL 106675, at *1 (E.D. Mo. Jan. 6, 2010).

**Conclusion**

Accordingly,

**IT IS HEREBY ORDERED** that the United States' motion for summary judgment (Doc. No. 46) is **GRANTED**. A separate judgment will accompany this Memorandum and Order.

**IT IS FURTHER ORDERED** that the Trustee's Motion for Discharge is **GRANTED**. (Doc. No. 79).

**IT IS FURTHER ORDERED** that the Trustee's Motion for an Award of Attorney's Fees is **DENIED** in part.  (Doc. No. 79).


_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 27th day of April, 2012.